UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Ortiz, Raphael and Lorish
Argued at Fairfax, Virginia


TYRONE LEE AMBERS

MEMORANDUM OPINION* BY
v.        Record No. 1905-24-4          JUDGE STUART A. RAPHAEL
FEBRUARY 17, 2026

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Robert P. Coleman, Judge

Collin Chayce Crookenden (Vanderpool, Frostick & Nishanian, P.C.,
on briefs), for appellant.

Kimberly A. Hackbarth, Senior Assistant Attorney General (Jason S.
Miyares,[1] Attorney General, on brief), for appellee.


Appealing his convictions for unlawful wounding, using a firearm to commit malicious

wounding, and shooting from a vehicle, Tyrone Lee Ambers claims that the trial court erred in

instructing the jury that malicious wounding is a separate and distinct charge from using a

firearm to commit malicious wounding. He also challenges the sufficiency of the evidence to

support the unlawful-wounding conviction. But his challenge to the jury instruction is barred by

the approbate-reprobate doctrine. And the evidence sufficed for the jury to find him guilty

beyond a reasonable doubt of unlawful wounding. So we affirm his convictions.

BACKGROUND

We recite the facts in the light most favorable to the Commonwealth, the party that

prevailed at trial. *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc). "Doing

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

so requires that we 'discard' the defendant's evidence when it conflicts with the Commonwealth's evidence, 'regard as true all the credible evidence favorable to the Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

*A. The highway shooting*

On August 25, 2019, Ambers took Interstate 66 from Front Royal toward Manassas, exiting onto the Prince William Parkway. While on the exit ramp, Ambers noticed a silver Chevrolet Impala pulling up behind him, getting "so close that he couldn't see the [front] bumper." Ambers pulled over to the shoulder of the exit ramp, retrieved a handgun from his waistband, and fired shots at the Impala as it passed by. The Impala sped away, and Ambers called 911 to report the shooting. He remained parked on the shoulder until officers arrived.

Barry Porter and Robert Fisher were test-driving the Impala with the owner's permission.[2] Porter was in the driver's seat when the shooting occurred. Fisher testified that he and Porter were "just talking like we do," and "[t]he very next thing is pow-pow." Bullets blasted through the passenger-side door, striking Fisher's ankles. Fisher survived, but the surgery he needed left "pins and rods in both . . . ankles."

Fleeing the gunfire, Porter and Fisher drove to Porter's house, where Porter "fell out [of] the car." Fisher crawled into the driver's seat and drove to his house, about 15 minutes away. He stumbled toward the house, collapsing at the front door. Fisher explained at trial that he went home rather than to the hospital because home felt like "the safest place." Having been shot before, Fisher said, "[i]t's just a habit of mine. When something happens, I'm gonna run home." From there, paramedics transported Fisher to the hospital.

---

[2] Porter died before trial for reasons unrelated to this case, and the Commonwealth nolle prossed the charges against Ambers relating to him.

Officer Ethan Hughart responded to Ambers's 911 call. Ambers told Hughart "that he was in a road rage incident getting off of 66 onto Prince William Parkway and he discharged a firearm at several subjects." Ambers claimed to have seen "a silver pistol in his rearview mirror being held by one of the subjects," though Ambers said he "was never shot at." After detaining Ambers in the back of his patrol car, Hughart drove him to the police station to speak with detectives.[3]

Detective Dennis Gill spoke with Ambers at the police station, where Ambers gave a similar account. He described the passenger (Fisher) as "a white male in his 20's or 30's." But when Gill showed Ambers a photo of Fisher, Ambers did not recognize him.[4] Upon further questioning, Ambers said that the gun was not pointed at him and that he might have been "mistaken that they had a gun."

*B. Ambers's jury trial*

Nine witnesses testified at trial. Investigator Corey Morrell processed Ambers's vehicle after Ambers was taken to the police station. Morrell "located three cartridge cas[ings], a Glock 19 firearm, two cell phones, and . . . two boxes of assorted 45 ammunition" in Ambers's car.

Sergeant Sean Weddel examined the Impala. The passenger-side window was shattered and there were "12 bullet defects on the right side of the vehicle." Photographs of the bullet defects were entered into evidence. Based on those defects and the bullet trajectories, Weddel concluded that the bullets were fired from outside the Impala. Weddel further observed "reddish-brown stains"—which he suspected to be blood—on the driver's-side and passenger-side floorboards. Weddel found no firearm or shell casings inside the Impala.

---

[3] Hughart's body-camera footage was admitted into evidence at trial.

[4] Gill received a real-time photo of Fisher from another officer at Fisher's house.

Investigator Luke Dean also inspected the bullet holes on the passenger side of the Impala. Dean agreed that the bullets came from outside the Impala; he inferred from their varied trajectories that the shots were fired from different angles. Dean recovered ten "projectiles" from the Impala. He found nothing to suggest that any gun was fired from inside the car.

After denying Ambers's motions to strike, the trial court instructed the jury on the elements of the alleged crimes. For malicious wounding, the trial court gave an agreed-upon waterfall instruction that included instructions for unlawful wounding and assault and battery. Over Ambers's objection, the court instructed the jury that, for the firearm charge, the Commonwealth had to prove:

> (1) That Mr. Ambers used; attempted to use a pistol, shotgun, rifle, or other firearm; and
>
> (2) That the use; occurred while Mr. Ambers was committing or attempting to commit malicious wounding.

Ambers objected that the instruction's "attempt language" would confuse the jury because Ambers was not indicted for *attempted* malicious wounding. The court accepted the parties' agreed-upon shooting-from-a-vehicle instruction.

During deliberations, the jury asked: "If the jury does not find Mr. Ambers guilty of malicious wounding in charge 2, can we find him guilty of using a firearm in the commission of malicious wounding? Do the charges go hand in hand?" The trial court proposed to respond by saying that the charges were separate and distinct and that the jury should consult the instructions it had been given.

Ambers's counsel agreed: "I think the Court's instinctual response is probably the one that answers the question . . . . And I think it's correct that the charges are separate and distinct offenses, and that that's an accurate statement." After the Commonwealth also agreed, the trial court instructed the jury: "The charges are separate and distinct offenses. You should carefully

consider the evidence as presented and rely on the instructions that were provided in making your determination."

The jury found Ambers guilty of unlawful wounding, using a firearm in the commission of malicious wounding, and shooting from a vehicle. Ambers immediately moved to set aside the verdict for the firearm charge, claiming the verdicts were "inconsistent, incompatible." The court continued the motion for briefing and argument.

Ambers argued that because the jury found him "not guilty of malicious wounding," then "as a legal matter" he could not be found "guilty of use of a firearm[,] which required his use of the firearm to have been done while committing or attempting to commit malicious wounding as was listed as an element in this case."

The court denied Ambers's motion and sentenced him to three years' incarceration, the mandatory minimum for the firearm charge (CR22001659-00). For the other two charges (CR22001657-00 and CR22001661-00), the court sentenced Ambers to five years' incarceration with three years and one month suspended on each charge, running concurrently with the three-year minimum sentence.

Before the final order was entered, Ambers's court-appointed appellate counsel filed a second motion to set aside the verdict, arguing that the court's response to the jury's question during its deliberations was "inadequate as a matter of law." Quoting *Johnson v. Commonwealth*, 20 Va. App. 547, 554 (1995) (en banc), Ambers claimed that "[b]y failing to advise the jury that the two charges went 'hand in hand' and that acquittal of . . . malicious wounding is acquittal of the use of a firearm charge, [the] [c]ourt 'failed to instruct the jury properly.'" The court denied the second motion to set aside the verdict and entered the sentencing order on October 30, 2024. Ambers noted a timely appeal.

ANALYSIS

This appeal presents two questions: whether the trial court erred when instructing the jury, and whether the evidence sufficed to convict Ambers of unlawful wounding.[5] We address each in turn.

### A. Ambers's jury-instruction argument is foreclosed by the approbate-reprobate doctrine.

Ambers argues that the trial court's instruction to the jury constituted reversible error under *Johnson*. In that case, the jury asked the trial court: "If the defendant is guilty of attempted unlawful wounding, can he also be guilty of use of a firearm in the commission of a felony?" *Johnson*, 20 Va. App. at 551. In response, the trial court instructed the jury that, "You have the instructions that are before the court. You have the two separate charges, and it's up to you to make that decision on each of the charges." *Id.* at 551-52. The jury found Johnson guilty of attempted unlawful wounding and using a firearm to commit a felony "as charged in the indictment." *Id.* at 552. This Court sitting en banc reversed, finding that "[t]he jury's inquiry manifested its concern about an obvious void in the instructions." *Id.* at 554. And "[b]y failing to respond, 'No,' to the jury's inquiry, the trial judge failed to instruct the jury properly." *Id.*

But finding that the approbate-reprobate doctrine presents the best-and-narrowest ground for resolving this appeal, *see, e.g.*, *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023), we decline to reach the merits of Ambers's argument. Before instructing the jury that the charges against Ambers were "separate and distinct," the court asked counsel whether doing so was appropriate. Defense counsel agreed that the court's "instinctual response" answered the jury's question, and that it was "correct that the charges are separate and distinct offenses." That is directly opposite

---

[5] Although Ambers also appealed the shooting-from-a-vehicle conviction (CR22001661-00), he did not address that issue on brief. So we do not consider it. *See Amazon Logistics, Inc. v. Va. Emp. Comm'n*, 304 Va. 107, 111 (2025) ("If an appellant fails to develop adequate argument in support of an assignment of error, the appellant waives that argument.").

the position he asserts here: that the instruction constituted reversible error. Ambers's

jury-instruction argument is thus foreclosed by the approbate-reprobate doctrine.[6]

The approbate-reprobate doctrine "forces a litigant to elect a particular position, and

confines a litigant to the position that [he] first adopted." *Matthews v. Matthews*, 277 Va. 522,

528 (2009). It applies to all litigants, and it "applies both to assertions of fact and of law."

*Commonwealth v. Holman*, 303 Va. 62, 71 (2024). Contrary to procedural-default principles,

"the litigant in the approbate and reprobate situation has affirmatively staked out a position or

asked the court to act." *Id.* at 72. The doctrine is thus "'broader and more demanding than' the

rules of procedural default." *Id.* (quoting *Alford v. Commonwealth*, 56 Va. App. 706, 709

(2010)). There is no ends-of-justice exception to the approbate-reprobate doctrine. *Nelson v.*

*Commonwealth*, 71 Va. App. 397, 405 (2020).

We reject Ambers's claim that "[b]ecause the error first emanated from the circuit court,

Ambers never 'affirmatively staked out a position or asked the court' to give the answer

ultimately delivered to the jury." Ambers's Reply Br. at 5 (quoting *Holman*, 303 Va. at 72). We

do not apply the approbate-reprobate doctrine "at such a granular level." *Holman*, 303 Va. at 74;

*AV Auto., L.L.C. v. Bavely*, 85 Va. App. 559, 578 (2025). Our applying the doctrine "does not

turn on whether a litigant has made a specific stipulation." *Holman*, 303 Va. at 74. It matters

instead that Ambers took the position below that the judge's instruction was correct. He is thus

confined to the same position here.[7]

_____

[6] The Commonwealth argues that Ambers's jury-instruction argument is equally foreclosed by Rule 5A:18 and the invited-error doctrine. Having decided that the approbate-reprobate doctrine applies, we do not reach whether Ambers's argument is also barred by procedural-default principles (Rule 5A:18) or the invited-error doctrine. *See, e.g.*, *Commonwealth v. Holman*, 303 Va. 62, 70 n.1 (2024) (acknowledging the distinction between the approbate-reprobate and invited-error doctrines).

[7] We likewise find no error in the trial court's denying Ambers's second motion to set aside the verdict (Assignment of Error IV). His third assignment of error, which addresses the

*B. The record supports Ambers's unlawful-wounding conviction.*

Ambers offers a few reasons why the trial court erred in denying his motions to strike. To start, he argues that Fisher's testimony should have been disregarded because it was inherently incredible. "Ordinarily, issues of witness credibility and the weight afforded a witness'[s] testimony 'are matters solely for the fact finder[,] who has the opportunity to see and hear th[e] evidence as it is presented.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 239 (2022) (second alteration in original) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018)). This Court accepts "the trial court's determination of the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). Witness testimony is not "inherently incredible 'unless it is "so manifestly false that reasonable men ought not to believe it" or "shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ."'" *Hammer*, 74 Va. App. at 239-40 (quoting *Gerald*, 295 Va. at 487). This Court "will not disturb a trial court's finding that a witness was not inherently incredible unless that determination is 'plainly wrong or without evidence to support it.'" *Id.* at 240 (quoting *Elliott v. Commonwealth*, 277 Va. 457, 463 (2009)).

Ambers cannot meet that standard here. He claims that Fisher's account was "irrational" because Fisher "did not attempt to get to a hospital or call 911" after the shooting. But Fisher explained his actions, and the jury was entitled to believe that he retreated to his home because that is where he felt safest. That Fisher became "defensive and argumentative" when confronted with his criminal history also does not render his testimony inherently incredible. Nor is it dispositive that Detective Israel Perla refuted Fisher's testimony "that he had no alcohol that

first motion to set aside, is waived because he did not address it in his opening brief. *See Amazon Logistics*, 304 Va. at 111 (arguments not briefed are waived).

day." "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). It was up to the jury to resolve the inconsistencies between Fisher's testimony and the other evidence. "'[T]here can be no relief' in this Court if a witness testifies to facts 'which, if true, are sufficient' to support the conviction '[i]f the trier of the facts' bases its decision 'upon that testimony.'" *Id.* at 626-27 (alterations in original) (quoting *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010)).

Ambers further argues that even if this Court accepts Fisher's testimony, the circuit court should have granted his motions to strike because the Commonwealth failed to prove the elements of unlawful wounding. He alleges that the Commonwealth failed to disprove every hypothesis of innocence because "[t]here was no testimony as to whose bullet caused Fisher's injury," and Ambers did not "demonstrate any intent to do harm." He maintains that his actions were not unlawful because, upon allegedly seeing Fisher with a firearm in the Impala, he acted "under the apprehension of imminent bodily injury or death."

"A motion to strike challenges whether the evidence is sufficient to submit the case to the [factfinder]." *Fergeson v. Commonwealth*, 84 Va. App. 80, 89 (2025) (alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "The only relevant question on appeal 'is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact,' in this case the jury, 'could have found the essential elements of the crime beyond a reasonable doubt.'" *Bennett v. Commonwealth*, 84 Va. App. 607, 619 (2025) (quoting *Commonwealth v. Barney*, 302 Va. 84, 97 (2023)). If there is evidentiary support in the record for the conviction, this Court "is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Chavez v.*

*Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

We reject Ambers's assertion that the Commonwealth failed to prove that he caused Fisher's injuries. Ambers admitted that he fired multiple shots at the Impala as it passed by him. Law-enforcement officers recovered multiple bullets and bullet fragments from the Impala. Those bullets matched Ambers's firearm. The trajectory of the bullets suggested that the Impala was hit from different angles as it passed by Ambers's car; blood stains were observed on the Impala's front floorboards. Fisher testified that he was shot in both ankles, which are now held together by pins and rods. That evidence supports the jury's conclusion that Ambers caused Fisher's injuries.

As for Ambers's intent, the jury heard two accounts of the shooting. Though Ambers described the shooting as a road-rage incident, Fisher described it differently. Fisher testified that he and Porter were test-driving the Impala, driving and talking like usual. Out of nowhere, they "got all blown up." What is more, Ambers admitted that he could have been mistaken that he saw Fisher holding a firearm. He also admitted that his car was never shot at, and he never saw a gun pointed directly at him.

Based on all the evidence, the jury was free to discredit Ambers's theory that he was acting in self-defense when he fired more than ten rounds into the Impala. Viewing the evidence in the light most favorable to the Commonwealth, the record amply supports the jury's conclusion that Ambers fired his gun at the Impala with the intent to kill or permanently injure the occupants.

CONCLUSION

We find no basis to disturb Ambers's convictions.

*Affirmed.*